**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARY J. FAURE, | : | CIVIL ACTION NO. 2:19cv1949 |
| 3225 Cimmaron Rd. | : | |
| Columbus, OH 43221-2632, | : | |
| | : | |
| Plaintiff, | : | |
| | : | JUDGE |
| v. | : | |
| | : | MAGISTRATE JUDGE |
| THE OHIO STATE UNIVERSITY, | : | |
| c/o Michael V. Drake, MD | : | |
| Office of the President | : | |
| 205 Bricker Hall, 190 North Oval Mall | : | |
| Columbus, OH 43210-1357, | : | |
| | : | |
| and | : | **COMPLAINT** |
| | : | |
| MONICA F. COX, Ph.D., sued in both her | : | |
| official and individual capacities, | : | |
| Chair, Department of Engineering Education | : | |
| 244F Hitchcock Hall | : | |
| 2070 Neil Ave. | : | |
| Columbus, OH 43210-1226, | : | |
| | : | |
| Defendants. | : | **Jury Demand Endorsed Hereon** |

## I.    Preliminary Statement

1.    This action seeks back pay; compensatory and punitive damages; declaratory, injunctive and equitable relief; prejudgment and post-judgment interest; and attorneys' fees and costs for the violations of Title VII of the Civil Rights Act of 1964; the Reconstruction Era Civil Rights Act, 42 U.S.C. § 1981; and the First and Fourteenth Amendments to the United States Constitution committed when Defendants pretextually terminated Plaintiff with a motivating factor being her white race and a but-for cause being retaliation for her complaining about racist comments and statements of racial animus toward white employees by her supervisor and Department Chair, Defendant Monica F. Cox,

which were implemented by adverse decisions affecting the terms and conditions of her employment, even though Plaintiff opposed in a responsible and non-disruptive manner employment decisions she reasonably and sincerely believed were racially discriminatory.

## II.    **Jurisdiction and Venue**

2.      This action brings discrimination and retaliation claims against Defendant Ohio State University under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*., pursuant to a Charge Affidavit timely filed on March 8, 2018, with the Equal Employment Opportunity Commission, subject to abeyance pending receipt of a right-to-sue notice on that administrative charge; and against Defendant Cox, pursuant to 42 U.S.C. § 1983, under 42 U.S.C. § 1981 and the First and Fourteenth Amendments to the United States Constitution.

3.      This Court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1331 (federal question); 1343 (civil rights).

4.      Declaratory, equitable, and injunctive relief is sought pursuant to 28 U.S.C. §§ 2201; 2202, with prospective injunctive relief to end a continuing violation of federal law by Defendant Cox available pursuant to 42 U.S.C. § 1983.

5.      Compensatory and punitive damages may be awarded under Title VII, 42 U.S.C. § 1981a, and 42 U.S.C. §§ 1981; 1983.

6.      Costs and attorneys' fees may be awarded pursuant to Title VII, 42 U.S.C. § 2000e-5(k); Fed. R. Civ. P. 54; and 42 U.S.C. § 1988.

7.      Venue lies in this forum pursuant to 28 U.S.C. § 1391(b) and S.D. Civ. R. 82.1 because the claims arose in Franklin County, Ohio, where Defendant The Ohio State University locates its headquarters and Defendant Cox made decisions infected by her racist attitude toward whites.

### III. Parties

8.      Plaintiff Mary J. Faure, white, was employed by Defendant The Ohio State University ("OSU") from 2003 until her termination from the full-time position of Director of the Engineering Technical Communications Program ("ETC") in the Department of Engineering Education ("EED") with OSU's College of Engineering on May 19, 2017, a position she had held since September 2011; was at the time of her termination supervised by Defendant Monica F. Cox, Ph.D., who recommended her termination and had that recommendation relied upon without significant investigation or independent review by superiors; had been recruited from OSU Newark in June 2004 to create a new Communications and Professional Development program for students in Agricultural and Construction Systems Management majors; had been a lecturer in the OSU English Department from August 1987 through August 2004 at the Columbus and Newark campuses; became full-time at OSU after a successful career in technical and business communications; earned from OSU a Masters of Arts, English-Rhetoric and Composition, and a Bachelor of Science in English Education, Composition, and Literature; and at all times material to this Complaint performed her job duties as Director in competent fashion.

9.      Defendant The Ohio State University ("OSU") is public research institution with the third largest university campus in the United States and regional campuses throughout Central Ohio; employs more than 500 full-time employees; is engaged in an industry – higher education -- affecting commerce; and is an employer covered by Title VII of the Civil Rights Act of 1964.

10.      Defendant Monica F. Cox, Ph.D., African-American, is being sued in both her official and individual capacities; is Chair in the Department of Engineering Education at OSU; the founder and owner of STEMinent LLC, a company focused on science, technology, engineering, and math ("STEM") education assessment and professional development for stakeholders in K-12 education,

higher education, and Corporate America; focuses her research on the persistence of Women of Color faculty in engineering; made the recommendation to terminate Plaintiff and had that recommendation relied upon without significant investigation or independent review by superiors; and, unless enjoined from continuing to make adverse decisions affecting the terms and conditions of her subordinates' employment which are motivated at least in part by her racist attitude and to retaliate against anyone who opposes such discrimination, will persist in doing so.

**IV.** **Facts**

11.     In January 2016, Defendant Cox was hired by OSU and appointed Department Chair.

12.     Before Defendant Cox became Plaintiff's supervisor, Plaintiff had never received discipline or counseling about her performance or attitude and consistently maintained positive relationships with her coworkers and superiors, and received positive performance evaluations.

13.     Before their first formal meeting on January 25, 2016, Plaintiff sent Defendant Cox a program overview report and staff summary in an attempt to respond to a direct request for this information expressed by Defendant Cox in previous emails.

14.     Near the outset of the meeting, Defendant Cox referred to the report and summary in a dismissive tone, saying, "Mary Faure!  Bringing an agenda to this meeting!"

15.     Tossing the report and summary on her desk, Defendant Cox said in a loud and angry tone, "I want you to hear how my background shaped me in to the person I am today."

16.     Defendant Cox then declared: "I despise white people."

17.     Amplifying on her statement, Defendant Cox said, "White people have put up barriers to my career success and I have worked against disadvantages in my workplace put up by you people."

18.     Defendant Cox proceeded to talk about disadvantages she had faced at Purdue University because of racism, saying "At Purdue, white people created disadvantages for me in every step of my

4

career there. I was at a disadvantage when I came there, I was at a disadvantage as an assistant professor, I was at a disadvantage as an engineering education researcher and as an associate professor. At every step of my career I was at a disadvantage. Now, I am at a disadvantage coming to Ohio State because of barriers put up by [jabbing toward Plaintiff with her finger] you people."

19.     Defendant Cox was unrelenting, saying, "The whites at Purdue put me at a disadvantage in my career. I have had to deal with barriers to my success and disadvantages in my whole career. When I earned Associate, I was the first Black Woman Associate Professor in Engineering at Purdue but no one knew who I was. People did not know who I was in meetings. I was an African American Associate Professor but no one knew who I was."

20.     Defendant Cox illustrated with an example how she had been treated at Purdue: "I was at a department meeting when I was insulted by another faculty member in front of the whole faculty. The Department Chair did not do enough to reprimand them. Later, I saw that people from the meeting were Tweeting about me and about the insult like it was funny and they agreed with the insult. I went to the Chair and complained that not enough was done to punish those old white men and now they were Tweeting about me."

21.     Defendant Cox then declared that she was going to sue Purdue: "I have a lawyer and I am going to show them. They are going to be sorry."

22.     On October 7, 2015, Defendant Cox discussed with a reporter from the *Journal & Courier*, a Lafayette, Indiana newspaper, becoming the first black woman to earn tenure at the Purdue University College of Engineering and facing barriers from the intersectionality of being a young, black, and outspoken woman.

23.     Defendant Cox was quoted by the reporter as saying: "I must constantly educate people about ways to engage respectfully and inclusively with an ambitious woman of color. * * * At first, I

5

saw this as a burden, but now I realize that one of the greatest opportunities that I have is to facilitate an open dialogue about issues of diversity, particularly as they pertain to women of color in higher education."

24. The month before, Defendant Cox and a team of researchers received $1.4 million in funding from National Science Foundation for a project entitled, "Why We Persist: An Intersectional Study to Characterize and Examine the Experiences of Women Tenure-Track Faculty in Engineering."

25. The reporter quoted Defendant Cox's hypothesis: "We think that there are climate issues that will help us understand more about why the numbers are the way they are."

26. Defendant Cox described the methodology, which involved interviewing 65 women faculty of color and interpreting the resulting data to find out what prompted these women to persist in engineering.

27. Plaintiff had not seen the 2015 article, was confused, frightened and astonished by both the content and vehement tone of Defendant Cox, and had responded, "Monica, your remarks are racist and unprofessional. Why are you saying these things to me? I don't understand what your remarks have to do with our work at OSU. I thought we were going to talk about the Technical Communications program."

28. Defendant Cox responded in a loud, threatening voice: "Mary! Mary!! Mary!!!" Rising from her chair, arms raised, and moving suddenly over the table toward Plaintiff, "If you repeat that [what she had said], I will deny it."

29. On February 3, 2016, Defendant Cox sent an e-mail and a document to EED stating that she was reviewing classes and implying that she might eliminate programs.

30. In early February, Plaintiff spoke with Defendant Cox about an issue involving one of the lecturers in the technical writing program, and after that brief interaction, attempted to question

Defendant Cox about the meaning of her remarks regarding whether the EED would offer some programs but not others in her recently published report: "If undergraduate courses are offered beyond the first-year (with the exception of the Multidisciplinary Capstone), EED leadership needs to identify resources to support these efforts. There should be an audit of what we keep and what we discard. …" Then, Defendant Cox changed the subject to denounce the Program Director, Dr. Peter Rogers, a Caucasian, as "a bully."

31.     Without any context, Defendant Cox asked Plaintiff, "Did you know there is a bully on the Leadership Team?"

32.     Plaintiff responded, "I have no idea what you mean.  Everyone on the team is great to work with and we've gotten a lot done for several years.  There is no bully on the team."

33.     Defendant Cox replied, "Oh yes there is!  Peter Rogers is a bully!"

34.     Plaintiff then asked why she would say that, and Defendant Cox answered: "He talks too much in meetings and interrupts the flow!"

35.     After Plaintiff protested that characterization, Defendant Cox said, "Well, he is a bully and I am going to set him straight."

36.     In March 2016, Plaintiff and Defendant Cox discussed that Plaintiff's responsibilities include several different areas, and Defendant Cox snapped, "Mary Faure!  You are all over the place.  I don't know what I'm going to do with you!  You'll notice I have not fired anyone on the Leadership Team yet."

37.     Feeling threatened by the March 2016 conversation in the context of Defendant Cox's earlier comments, Plaintiff met on February 16, 2016 with Marty Smith, College of Engineering Director of Human Resources, and reported what Defendant Cox had said about white people, and attempted to make a formal complaint about her racist statements and attitude and her management.

38.     HR Director Smith cautioned Plaintiff against making a formal complaint, saying that it could "come back on you," but adding that he would look in to the matter.

39.     At that meeting and during her subsequent discussions about Defendant Cox, Plaintiff reasonably and sincerely believed that the racist comments and statements of racial animus toward nonminority employees by Defendant Cox would permeate and actually had permeated employment decisions she made.

40.     In early March 2016, Plaintiff met with Defendant Cox to discuss Plaintiff's classes for the upcoming year, and Defendant Cox detoured the conversation by asking, "Why are there so many old white men in EED?  Big Lips and Colonel Sanders will have to go and so will the Bully."

41.     Plaintiff asked Defendant Cox about the nicknames, though she recalled the prior denunciation of Dr. Rogers, but Defendant Cox did not respond and instead ended the meeting.

42.      Later in March, Plaintiff returned to Human Resources Director Smith, outlined her concerns about Defendant Cox's racist comments and attitudes and management and how the racist attitude affected decisions Defendant Cox was making, and was told by him, "Those are serious allegations, Mary.  You would not want those documented."

43.     Frustrated by Human Resources Director Smith's response, Plaintiff asked to whom she could talk about her grievance if he would not help, and he stated that he was the only person to talk to about the issue.

44.     In early April 2016, Plaintiff raised the racist comments and attitudes of Defendant Cox with another Program Director, Dr. Rick Freuler.

45.     Dr. Freuler advised Plaintiff to discuss her concerns with Human Resources Director Smith, and she responded that she had twice done so without any discernible steps being taken.

46. On April 22, 2016, Plaintiff learned that Defendant Cox had, after originally vowing not to change the workload of the technical writing program, reduced the teaching loads of some members of her team.

47. In Plaintiff's years of experience at OSU, Department Chairs would consult with Program Directors before making materially adverse employment decisions about Program employees. Departments paid their Program employees based upon the number of sections taught. The University published a standard workload rubric by which to allocate workload and pay for Program employees, called Lecturers. In the spirit of that standard, reducing the number of classes delivered by Program employees would reduce their pay by a commensurate amount.

48. Based on that consultation, Program Directors had been able to communicate with Program employees to avoid both surprise and unduly hurt feelings and ensure clarity.

49. A reduced teaching load affects salary and benefits conditioned on a higher load, though through a conversation with a Program employee, ostensibly approved by Defendant Cox had promised to maintain the salary level despite the reduction.

50. The Program team members were confused yet pleased about the workload reduction lacking any effect on their salary and why reductions were being made in the first place.

51. Those Program team members were also bothered by the failure of Plaintiff to give them a heads up, to discuss options with them, and otherwise engage with them about the reductions.

52. Plaintiff's conversation with Defendant Cox in March and April about workloads resulted in Defendant Cox assuring Plaintiff that her team's workload would not be reduced, so Defendant Cox went back on her word to Plaintiff with no explanation or warning. Because Defendant Cox had not provided advance notice to Plaintiff, the established custom of Program Directors communicating with affected Program team members had not occurred.

53.     During a late April 2016 meeting with her team and in light of the confusion caused by the Defendant's decisions regarding workloads, Plaintiff explained what had happened, openly discussing Defendant Cox's racist comments and attitudes and how they might explain her hostility toward the Program. One member of the team (Lynn Hall) at that meeting declared in a disrespectful and derisive voice that she did not believe the Plaintiff because her own interactions with Defendant Cox were cordial.

54.     On April 22, 2016, despite being told before by Defendant Cox that she had widespread duties, Plaintiff learned at a meeting with Defendant Cox that her responsibilities were being expanded by several new tasks and included chairing a new committee called Professional Development.

55.     The Plaintiff asked several questions about specific points of the new tasks, which the Defendant refused to answer. The expansion was not accompanied with a formal promotion or additional staff, though it added to Plaintiff's workload.

56.     Plaintiff explained to Defendant Cox that, given her current teaching load and Program duties, it would be difficult to quickly complete the new tasks.

57.     Defendant Cox responded, "Oh, Mary, just get them done, you know how to do these, don't you?"

58.     At the end of their conversation, Defendant Cox added that, if Plaintiff completed the tasks, a promotion might be made.

59.     In May 2016, Plaintiff revisited with Defendant Cox the added responsibilities, seeking review for one of the assigned writing tasks, which the Defendant refused to accommodate, and the possible promotion, but Defendant Cox emphatically denied what she had said: "Mary Faure! I never said anything about a promotion for you."

60.     On May 3, 2016, Plaintiff and Defendant Cox attended the National Academy of Engineering (and National Science Foundation) Conference on STEM Workforce, a national conference held at the OSU student union.

61.     During a break, Plaintiff stepped away from the activity to check email.  Defendant Cox approached and sat down with Plaintiff unexpectedly, interrupting Plaintiff's review of messages. Rather than reflecting upon the content of sessions at the conference, Defendant Cox unloaded a tirade of resentment in words to the effect of: "People at this conference do not know who I am!  I am an African American Woman Department Chair, and no one knows who I am!  People should know who I am when I enter a room.  I have always been at a disadvantage in my career.  Now, everyone should know I am the Chair.  I came to OSU with disadvantages, and everyone is putting up barriers to my success.  I have been at a disadvantage in every step of my career.  Now, people should know I am the Chair."

62.     Defendant Cox then stressed how "shabby" OSU buildings were and returned to the way she was being mistreated: "I just found out that other full professors are being paid more than I am.  I should be paid the same rate that they are.  The pay gap at OSU is insulting.  It is just another disadvantage that I have to deal with.  All of these barriers to my success put me at a disadvantage.  I am the Chair, I should make more than other faculty.  Sometimes I work 16 hour days as the Chair, and I should be paid more than any other full professor."

63.     Finally, Defendant Cox emphasized that Program employees were insufficiently supportive: "People in the EED don't support me.  I expect everyone to support me.  The Leadership Team is not supporting me.  I expect service from them.  Everyone should support me.  I am the Leader, and everyone should support me.  I am hearing reports that people don't support me but, when I walk

down the hall, everyone smiles in my face and then talks about me behind my back. They should support me."

64.     Plaintiff soon learned that Defendant Cox had made similar comments about the Leadership team's failure to provide "service and support" during a break to Aimee Ulstad from Industrial Systems Engineering.

65.     On May 5, 2016, Plaintiff again complained to Human Resources Director Smith about Defendant Cox's racist statements and attitude and management and how the racist attitude was infecting employment decisions, telling him that others in the EED also had similar issues with Defendant Cox, including being told that she would deny saying what she had said if it was reported.

66.     Human Resources Director Smith repeated his warning that any allegations against Defendant Cox were likely to "come back" against Plaintiff, reminded her that Defendant Cox was "internationally known," and emphasized that her allegations would be "your word against hers," implying that Plaintiff would not be believed in light of Defendant Cox's resume.

67.     Plaintiff specifically asked Human Resources Director Smith what she needed to do for him to start an investigation of Defendant Cox's behavior, asking what evidence he would need, but he did not answer.

68.     Towards the end of May 2016, Plaintiff met with Associate Chair of EED Dr. Lisa Abrams to discuss staffing issues and disclosed that she had spoken with Human Resources Director Smith about Defendant Cox's racist statements and attitude and management and how the racist attitude had infected her employment decisions.

69.     Dr. Abrams was upset, saying, "You went to Marty Smith?"

70.     Given the tone and content of her response, her close relationship with Defendant Cox, and the chain-of-command reporting duties, Dr. Abrams must have told Defendant Cox about her conversation with Plaintiff.

71.     On May 31, 2016, Defendant Cox conducted an annual performance evaluation of Plaintiff, rating her as "exceeds expectations."

72.     During her final three years of teaching, Plaintiff overwhelmingly received scores of "4+" or "5" (on a scale where 1 is the lowest ranking and 5 is the highest ranking) on student evaluations. The University reported "average" score for similar courses is a 4.3.

73.     In her position Plaintiff had created a new program to serve the Professional Development, Diversity, and Communications needs of undergraduate students; increased enrollments from 600 to more than 1,700 undergraduate students from 53 majors; and engaged OSU faculty and staff, industry partners, and other stakeholders to determine student learning needs.

74.     Plaintiff also collaborated across OSU with individuals at all levels on topics regarding professional development, career materials preparation, and the communications needs of undergraduate and graduate students and programs to serve those needs.

75.     Plaintiff had hired, trained, and managed a staff of professional educators delivering sections of Engineering 2367, the second-level writing course designed for engineering students, and ECE 3090; a third-level technical communications course for students in Electrical and Computer Engineering, and teaching a graduate-level writing course.

76.     Plaintiff annually provided Communications and Professional Development courses for underrepresented student groups in the Summer Bridge program.

77.     Plaintiff was a constantly available consultant on questions and issues regarding technical writing and delivering oral presentations in academic and industrial settings.

78.     Plaintiff led workshops on grant and proposal writing, resume and cover letter development, interviewing skills, interpersonal skills, oral communications, digital media use, writing topics; scholarship on teaching and learning.

79.     Plaintiff also served on a wide variety of departmental and OSU committees.

80.     None of Plaintiff's job duties involved reporting to Human Resources about Defendant Cox's racist statements and attitudes and the effect on her management of that racist attitude.

81.     Having as a Department Chair someone who despised whites, blaming them for barriers she had hurdled, related to a matter of public concern – racism – which transcended a mere personnel dispute.

82.     During a July 7, 2016, meeting Defendant Cox berated team leaders for not supporting her fully, explaining that she was at a "disadvantage" as chair because of this lack of support.

83.     The word "disadvantage" was the same one she had used in her earlier conversation with Plaintiff about barriers imposed by white employees.

84.     In a surprising move, Defendant Cox ended the meeting by disbanding the leadership team.

85.     In May, Defendant Cox had suffered a miscarriage, and, at the July 7, 2016 meeting, she blamed Program employees for causing that miscarriage by the stress they inflicted upon her.

86.     Plaintiff reported to Human Resources Director Smith the next day about the disbanding, her perception that it was race-related, including Defendant Cox's code word – disadvantage -- for white prejudice against her, and her blaming the team for her miscarriage.

87.     From their first meeting, Plaintiff had consistently complained to Human Resources Director Smith about Defendant Cox making decisions regarding the terms and conditions of her and the

other Program team employees' employment through Defendant Cox's prism of racism and despising whites.

88.     All of the Program leadership was then white.

89.     On July 26, 2016, Defendant Cox surprised Plaintiff by having her meet with Human Resources Generalist Heather Eurez and Defendant Cox.

90.     Having a Human Resources Generalist at their meeting was unprecedented, and Plaintiff asked whether she was being disciplined.

91.     Human Resources Generalist Eurez denied that discipline was involved, saying she was just there to witness the meeting.

92.     Defendant Cox proceeded to accuse Plaintiff, and others of being upset because she was losing power within the Department.

93.     Plaintiff denied that concern, explaining that her only concern at OSU was serving the students.

94.     The meeting was bizarre, Eurez never spoke, and Plaintiff felt that Defendant Cox was attempting to document reasons other than her racist comments and attitude for why Plaintiff would complain about her.

95.     In later conversations, Defendant Cox repeated her accusation that white members of EED were out to get her and did not support her.

96.     Defendant Cox did not provide details and warned Plaintiff that, if she reported the accusations, Defendant Cox would deny making them.

97.     Defendant Cox persisted in using derogatory nicknames about white employees, once said she would go "ghetto" on Dr. Rogers, a statement Plaintiff understood to mean she would do damage to his career, and regularly referred to white employees as "you people."

98.     By the start of the 2016-2017 academic year, Plaintiff learned that some employees in EED had resigned because of Dr. Cox's treatment of them.

99.     On September 14, 2016, Dr. Cox scheduled a meeting for September 16, with Human Resources Director Smith attending.

100.    Plaintiff asked if this meeting was for disciplinary purposes, and Human Resources Director Smith said it was not.

101.    Then, Human Resources Director Smith surprised Plaintiff by saying that Defendant Cox had raised concerns with him about Plaintiff being unprofessional.

102.    Plaintiff flatly denied that she had ever been unprofessional. Director Smith expressed that in some circumstances, when information is not shared with Plaintiff, they expected Plaintiff to "make up something" to tell unhappy department employees.  Plaintiff refused to lie to employees.

103.    After the meeting Defendant Cox sent Plaintiff an email criticizing her for unprofessionalism.

104.    Plaintiff believes that Defendant Cox sent that email to concoct a paper trail documenting grounds for discharging her.

105.    Toward the end of the meeting, Defendant Cox had asked Plaintiff where she saw herself in six to nine months.

106.    Plaintiff took that the question to mean that Defendant Cox was going to end Plaintiff's tenure at OSU, and the later email represented a step in that direction.

107.    Approximately a week later, Plaintiff met with Associate Chair of EED Dr. Abrams to discuss the environment in EEC, and Dr. Abrams told Plaintiff that Defendant Cox preferred that Plaintiff no longer speak with Human Resources regarding her concerns with the department.

108.    Plaintiff responded that she should have the right as an OSU employee to discuss concerns with Human Resources.

109.    Dr. Abrams responded by repeating that Defendant Cox preferred that Plaintiff not go to Human Resources with complaints.

110.    The context of what Dr. Abrams twice said made it clear that she had spoken with Defendant Cox and was giving Plaintiff a message from Defendant Cox.

111.    For months, Defendant Cox had repeatedly declared that any questions or problems should be brought to her before being taken outside her department. But Defendant Cox stymied any attempts for Plaintiff to work with her. Plaintiff sought to meet with Defendant but was denied meeting times or appointments. Plaintiff sought Defendant Cox when Cox's office door was open, and was denied access repeatedly. Plaintiff sought to catch Defendant Cox in the hallway or in other spaces outside the office in order to get information.

112.    Throughout the 2016-2017 academic year, Defendant Cox continued to act aggressively towards Plaintiff, make offensive comments about white people, and criticize her professionalism.

113.    In late November 2016, Plaintiff sent an email to College of Engineering Dean David Williams complaining of "harassment, hostility, threats, intimidation, bullying, mismanagement, racist remarks, theft (no consent) of intellectual property, observed favoritism for a few, and lying that [Program employees] have endured" from Defendant Cox and Associate Chair of EED Dr. Abrams.

114.    Dean Williams asked Associate Chair of Academic Affairs Dr. Buchheit to investigate. Dr. Buchheit met with Plaintiff in early December 2016, where she again reported racism, threats, and discrimination by Defendant Cox and that she had complained repeatedly about that to Director Smith.

115.    In early December 2016, Plaintiff had met with Associate Chair of Academic Affairs Dr. Rudy Buchheit and complained about Defendant Cox's racist statements and attitudes and the way her racist attitude infected employment decisions.

116.    Dr. Buchheit did not seem surprised, and Plaintiff believes that other EED employees had already met with him and reported concerns about Defendant Cox.

117.     In mid-January 2017, Dean Williams and Dr. Buchheit met with EED leadership, including Defendant Cox, Dr. Abrams, and Plaintiff, to show their support for Defendant Cox and remind others that they had to be outwardly supportive of Defendant Cox even if they disagreed with her during leadership meetings.

118.    On April 6, 2017, Plaintiff fell ill and took an FMLA-approved medical leave of absence from OSU.

119.    After Plaintiff returned to work on May 15, 2017, Defendant Cox discharged her on May 19, 2017, stating she "failed to meet performance expectations."

120.    One criticism of Plaintiff regarded a February 3, 2016 email with an attached report from Defendant Cox which implied that several classes Plaintiff taught were under consideration to be eliminated.

121.    Plaintiff allegedly did not bring her concerns directly to Defendant Cox and instead spoke with EED team members who then relayed those concerns to Defendant Cox.

122.    In fact, Plaintiff went directly to speak with Defendant Cox about what the email meant about her future with EED.

123.    After Defendant Cox sidetracked that discussion to denounce Dr. Rogers as a "bully," Plaintiff sought the advice of other EED employees about their understanding of the email and report.

124.    Defendant Cox learned about what Plaintiff had done and then sent her an email complaining that she was fomenting others to question the report.

125.    OSU has a progressive discipline policy which is customarily followed absent an imminent threat or severe misconduct.

126.    Notwithstanding her years of solid performance, including professionalism, Plaintiff was not afforded progressive discipline.

127.    Defendant Cox provided a memorandum to Human Resources documenting the performance issues she alleged Plaintiff was having, futile counseling she had allegedly given, and observations from others about Plaintiff's disagreement with and questioning of Defendant Cox's decisions and leadership.

128.    In April 2017, Defendant Cox met with Human Resources Director Smith, Engineering College Human Resources Employee Relations Manager Heather Miller, and Dr. Buchheit to discuss performance issues Defendant Cox had reported.

129.    Defendant Cox's report was the focal point of all discussion, including later with Dean Williams; there was no independent investigation of the report, nor was Plaintiff provided a copy and an opportunity to respond; and, after Defendant Cox, Dean Williams, Dr. Buchheit, Human Resources Director Smith, and Employee Relations Manager Miller agreed with the report, it was the report which was given to OSU's Office of Human Resources for approval of Plaintiff's discharge.

130.    Defendant Cox's report was tainted by her racist attitude and resentment of Plaintiff's repeated complaints about her racist statements and attitude and the way her racist attitude had infected employment decisions.

131.    Defendant Cox's report exaggerated or falsified Plaintiff's behavior and downplayed or denied her contributions and lengthy record of performance exceeding expectations.

132.    Defendant Cox's report and her embellishment of the report during discussions significantly influenced the other's agreement with her decision to discharge Plaintiff.

133.    Defendant Cox intended to secure Plaintiff's discharge when she wrote and distributed the report and discussed it.

134.    Defendant Cox's report and discussion were the proximate cause of Plaintiff's discharge.

135.    Defendant Cox knew that her report would be relied on nearly exclusively by College and OSU administrators to justify Plaintiff's discharge.

136.    Terminating Plaintiff enabled Defendant Cox to employ a minority to perform job duties which Plaintiff had been performing.

137.    Plaintiff has been unable, despite the exercise of reasonable diligence, to secure a position comparable in salary, benefits, and career opportunities to the position she had at OSU.

138.    Defendants' discrimination and retaliation proximately caused Plaintiff loss of income, benefits, and career opportunities; emotional distress; anguish; frustration; and humiliation.

139.    In deciding to terminate Plaintiff on pretextual grounds, Defendant Cox manifested ill will or a spirit of revenge toward Plaintiff and/or acted in conscious disregard of her statutory rights in a way that was highly probable to cause her substantial harm.

## V.    Claims for Relief

### A.    Retaliation in Violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

140.    Paragraphs 1 through 139 above are realleged and incorporated herein.

141.    By terminating Plaintiff for opposing in a responsible and non-disruptive manner the racist attitude of her superior and its manifestations, which she reasonably and sincerely believed were race discriminatory, Defendants have committed retaliation in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981.

**B.** **Retaliation in Violation of the First Amendment as Incorporated in the Fourteenth Amendment.**

142.    Paragraphs 1 through 139 above are realleged and incorporated herein.

143.    By terminating Plaintiff for making statements of public concern detailing her opposition in a responsible and non-disruptive manner to the racist attitude of her superior and its manifestations, which she reasonably and sincerely believed were race discriminatory, Defendants have retaliated against her protected expression in violation of the First Amendment as incorporated in the Fourteenth Amendment.

**C.** **Discrimination in Violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.**

144.    Paragraphs 1 through 139 above are realleged and incorporated herein.

145.    By terminating Plaintiff when a motivating factor was her race, Defendants have committed race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Defendant Cox has violated 42 U.S.C. § 1981.

**VI.** **Prayer for Relief**

WHEREFORE, Plaintiff prays that this Court:

a.      declare that Defendant OSU has violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Defendant Cox has violated 42 U.S.C. § 1981 and the First Amendment;

b.       order such injunctive and equitable relief as will make Plaintiff whole for Defendants' violations, including reinstatement with full back pay and benefits, and pre- and post-judgment interest;

c.      award compensatory and, against Defendant Cox, punitive damages in excess of $75,000;

d.      allow a reasonable attorneys' fee and costs; and

e.      grant such other relief as the Court may deem appropriate.

Respectfully submitted,

By: */s/ John S. Marshall*
John S. Marshall (0015160)
(*jmarshall@marshallforman.com*)
Edward R. Forman (0076651)
(*eforman@marshallforman.com*)
Samuel M. Schlein (0092194)
(*sschlein@marshallforman.com*)
Helen M. Robinson (0097070)
(*hrobinson@marshallforman.com*)
MARSHALL AND FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (510) 250-900

## JURY DEMAND

Plaintiff requests a trial by a jury of eight (8) persons.

By: */s/ John S. Marshall*
John S. Marshall (0015160)