**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**MARY FAURE,**

          **Plaintiff,**                       **Case No. 2:19–cv–1949**
                                              **Judge Edmund A. Sargus, Jr.**
          **v.**                               **Magistrate Judge Chelsey M. Vascura**

**THE OHIO STATE UNIVERSITY, et al.,**

          **Defendants.**

<u>**OPINION AND ORDER**</u>

This matter is before the Court on Defendants The Ohio State University ("OSU") and Dr. Monica F. Cox, Ph.D.'s (collectively, "Defendants") Motion for Summary Judgment. (ECF No. 44.) The parties have fully briefed the motion and it is ripe for decision. (ECF Nos. 46, 47.) For the following reasons, the Court **DENIES** Defendants' Motion for Summary Judgment.

**I.**         **STATEMENT OF FACTS**

This case arises out of Plaintiff Mary Faure's termination of employment with Defendant OSU. Ms. Faure worked for OSU from 1987 until her termination in 2017. She started as a part-time lecturer before becoming Communications Program Director for the Engineering Education Innovation Center (EEIC). In 2015, the EEIC merged into the Engineering Education Department (EED), one of several departments in the OSU College of Engineering. Ms. Faure became Director of Engineering Technical Communications for the EED. In this role, she led a team of lecturers and worked with the EED Career Services Department to help students apply for jobs. (Faure Dep. at 19, 21, 23, 29–30, 44; Faure Dec. ¶¶ 3, 8; Hall Dec. ¶ 6.)

### A.      Dr. Cox's Alleged Comments About Race

David Williams, Dean of the OSU College of Engineering, selected Dr. Monica Cox as the Chair of the EED soon after the EED's formation. (Faure Dep. at 46, 49.) On January 25, 2016, Dr. Cox and Ms. Faure met to discuss Ms. Faure's Technical Communications program and the team of lecturers Ms. Faure supervised. (*Id.* at 147:11–17.) During the meeting, Ms. Faure alleges that Dr. Cox said, "I despise white people" multiple times and discussed "barriers and disadvantages that white people had put up against her in her previous life." (*Id.* at 140:11–20.) According to Ms. Faure, Dr. Cox "pointed her finger at [Ms. Faure] and said, 'I have been at a disadvantage my whole career because of you people.'" (*Id.* at 140:22–141:1.) Dr. Cox recounted an experience where a colleague at Purdue University made an insulting remark, but the chair of her department "did not deal with these old white men for their insult." (*Id.* at 141.) Ms. Faure avers that she told Dr. Cox the comments were "racist and unprofessional" and that the discussion was not related to the Ms. Faure's program. (*Id.* at 147:11–17.) Ms. Faure further alleges that Dr. Cox said, "Mary, Mary and then she went like this at me (pointed her finger) and I pushed back in my chair and she said, 'if you repeat that I'll deny it.' I thought she was going to strike me." (*Id.* at 147:18–23.) Dr. Cox admits that she discussed her background at Purdue with Ms. Faure during this meeting but denies making statements referring to "you people" or "old white men." (Cox. Dep. Ex. G, 26–27.)

Ms. Faure and other EED employees allege that, throughout 2016 and 2017, Dr. Cox made racist statements about white people such as: there were "so many old white men in the EED;" "white men in the EED held too much power;" "white people are too sensitive;" referring to white individuals in the EED as "big lips" and "Colonel Sanders;" calling a white male professor "a bully" and said, "he talks too much in meetings." (Faure Dep. at 212–215; Frueler Dep. at 55:5–

16; Lindeboom Dec. ¶12–15; Sorby Dec. ¶ 8–9; Faure Aff. ¶ 15.) An administrative assistant who worked for Dr. Cox for 16 months stated that Dr. Cox made race-based comments at least once a month and would warn her, "if you say I said this, I'll deny it." (McGrath Dec. ¶¶ 2, 7, 14.)

### B. Ms. Faure's Complaints about Dr. Cox

Ms. Faure allegedly complained to HR and EED leadership about Dr. Cox several times between February and December 2016. In February 2016, Ms. Faure met with HR Director Marty Smith to lodge a formal complaint against Dr. Cox for her statements that she "despised white people" and, if Ms. Faure repeated what she said, she'd deny it.

A few weeks later, Ms. Faure again met with Mr. Smith and complained about Dr. Cox's conduct, saying, "you know I'm having trouble dealing with this, do you have any suggestions?" Mr. Smith told her to discuss her feelings with Dr. Cox rather than taking formal action. (Faure Dep. at 242:11–15.) Ms. Faure met again with Mr. Smith in late April or early May 2016 and told him that talking to Dr. Cox "didn't work, the [racist] comments have continued…And I was kind of at a loss, I said why—why has there been no action?" (*Id.* at 243:14–20.) During that meeting Ms. Faure again told Mr. Smith that Dr. Cox referred to white people as "you people" and that Dr. Cox "despises white people and old white men." (Faure Dec. Ex 1.)

In April 2016, Ms. Faure told EED Program Director Dr. Rick Freuler that she was concerned with Dr. Cox's racism. (Faure Aff. ¶ 23.) Ms. Faure informed him that she had already spoken to Mr. Smith, and Dr. Freuler was allegedly concerned that Mr. Smith had not taken action. (*Id.*)

In May 2016, Ms. Faure told Dr. Lisa Abrams, Associate Chair of the EED, that she complained about Dr. Cox's racist remarks and threats to Mr. Smith. (Faure Dep. at 244:3–5.) Dr. Abrams was allegedly upset that Ms. Faure had talked to Mr. Smith. (*Id.* at 244:6–10.)

In July 2016, Dr. Cox disbanded the leadership team. Ms. Faure believed Dr. Cox's decision was race related and reported it to Mr. Smith. (Faure Aff. ¶¶ 32–34.) That summer, Ms. Faure alleges that Dr. Cox continued to use derogatory nicknames for white employees and stated that she would "go ghetto" on a white professor named Dr. Rogers. (*Id.* ¶¶ 36, 37.)

In September 2016, Dr. Cox and HR Director Smith met with Ms. Faure because Dr. Cox believed Ms. Faure was acting unprofessional. (*Id.* ¶ 39.) After that meeting, Associate Chair Dr. Abrams allegedly told Ms. Faure that Dr. Cox prefers if she stop going to HR anymore with complaints. (*Id.* ¶ 41; Abrams Dep. at 6:8–16.)

On November 26, 2016, Ms. Faure sent the following email to Dean Williams:

> After much reflection and many months of abuse, I am writing as the emissary for a group of distressed EED employees who desire to report to you personally about the harassment, hostility, threats, intimidation bullying mismanagement, racist remarks, theft (no consent) of intellectual property, observed favoritism for a few and lying that they have endured from Monica Cox and Lisa Abrams.

(emphasis in original) (Faure Dep. Ex. 32).

In response to her email, Rudy Buchheit, EED Associate Chair of Academic Affairs, met with Ms. Faure in December 2016. Ms. Faure alleges that she complained to him that Dr. Cox made racist statements. (Faure Dep. at 500:20–504:1.) Dean Buchheit alleges, however, that Ms. Faure did not complain about racist statements and instead complained that Dr. Cox was conducting herself inappropriately in meetings and misallocating resources. (Buchheit Dep. at 21.) Dean Buchheit concluded that Ms. Faure was "not appreciating the leadership approaches that [Dr.] Cox was using" but also found that Dr. Cox was "conducting herself in inappropriate ways" during meetings and while making decisions such as resource allocation. (Buchheit Dep. at 21:9–20.)

A few weeks later, Ms. Faure met again with Mr. Smith to file a complaint that Dr. Cox was retaliating against Ms. Faure for her complaints about the alleged racist comments. (Smith Dep. at 58; Faure Dep. at 505–518.)

### C. Dr. Cox's Alleged Retaliation

Ms. Faure alleges that her relationship with Dr. Cox changed after she had made the complaints. "She became hostile. It was like a light had been switched on." (Faure Dep. at 185:7–14.) Dr. Cox allegedly became noticeably cold to Ms. Faure in meetings. According to Ms. Faure, Dr. Cox was dismissive to her in a leadership team meeting. At the end of the encounter, a coworker talked to Ms. Faure. (Faure Dep. at 495–496.) Ms. Faure alleges that Dr. Cox reduced her team's teaching loads but did not make this sort of change with any other team or program. (Faure Aff. ¶ 24.) Ms. Faure alleges that Dr. Cox asking her to draft an article, refusing to review it or provide any guidance, and then chastised her for failing to meet expectations. (*Id.*)

Ms. Faure allegedly became worried that Dr. Cox was "going after [her] professionally." (*Id.* at 187:2–9.) Ms. Faure avers that Dr. Cox was beginning to "paper a file and accuse [her]" of false misconduct and workplace issues. (*Id.* at 186:4–12, 238:7–13) On October 18, 2016 Dr. Cox sent HR personnel Marty Smith, Heather Miller and Heater Eurez an email with the subject line, "Mary Faure Personnel Documentation." It contained a compilation of alleged concerns with Ms. Faure. (Cox Dep. at Ex G.) The document, which was updated by Dr. Cox on December 2, 2016 and January 27, 2017, contained the names of four individuals who allegedly had problems with Ms. Faure, as well as bullet-point concerns. (*Id.* at 99:17–20, Ex G.)

Ms. Faure alleges that Dr. Cox included inaccurate statements in her file about Ms. Faure. For instance, when Dr. Cox asked to schedule a director's meeting, another person had a conflict and asked to move the meeting, but Dr. Cox noted that Ms. Faure could not "find time in her

schedule" to meet. (Cox Dep. at 373:3–8, Ex G) (Lengle Dep. at 44:20–50:30). Another instance occurred where Dr. Cox wrote that Ms. Faure opposed moving offices and complained to an employee. There is testimony, however, that many other employees also opposed the move because it was over a holiday break and many people were moving. (Cox Dep. at Ex G; Eurez Dep. at 81:24–82:2, 83:2–22; Frueler Dep. at 70:3–12; Rhoads Dep. at 11:14–19.)

### D. Ms. Faure's Alleged Problematic Conduct

Dr. Cox alleges that Ms. Faure acted unprofessionally multiple times in 2016 and documented her concerns. Her first issue with Ms. Faure occurred in February 2016. Dr. Cox had sent out a report analyzing the strengths and weaknesses of the EED. (Faure Dep. Ex. 9.) Ms. Faure believed the report indicated that Dr. Cox would eliminate the ETC program. She allegedly began telling lecturers on her team that their jobs may be in jeopardy. (*Id.* Ex. 1.) After Ms. Faure's conversations, four ETC lecturers asked to meet with Dr. Cox and said they were worried about losing their jobs. Dr. Cox emailed Ms. Faure to say that Ms. Faure should have "contacted [her] directly" instead of "assuming [her] intentions." (Cox Dep. 98–101, 321–322, 325, Ex. 11, Ex. G at 36; Faure Dep. Ex. 11.)

Even after the incident, Dr. Cox evaluated Ms. Faure's performance in May 2016 as "exceeds expectations." (Cox Dep. Ex. A.) Dr. Cox said Ms. Faure was "an enthusiastic member of the EED who demonstrates excellence and professionalism [and]…is receptive to feedback and quickly makes adjustments in areas of need within the EED." Dr. Cox rated Ms. Faure as outstanding in categories for quality of work, productivity, and effectiveness. (Cox Dep. at 171–174; Eurez Dep. at 90, Ex. A.) Dr. Cox believed at that time that she and Ms. Faure had worked through their communication issues. (Cox Dep. at 176.)

During the summer of 2016, Dr. Cox and Associate Chair Dr. Abrams noted several incidents where they believe Ms. Faure acted unprofessionally. In early July 2016, a lecturer told Dr. Cox that Ms. Faure was publicly complaining that Dr. Cox was requiring her and the ETC team to manage the EED's social media when they should not have to do so. (Cox Dep. at 126.) Other ETC lecturers reported to Associate Chair Dr. Abrams that Ms. Faure had told them not to trust Dr. Cox and Dr. Abrams, they should be worried for their jobs, and they were not valued members of the EED. (Abrams Dep. at 41.) Ms. Faure allegedly emailed the College of Engineering's finance personnel and other leaders about their delay in sending offer letters to the EED lecturers, complaining that her team felt "their service to OSU Engineering and they themselves as human beings are undervalued." (Faure Dep. at 417, Ex. 49.) Dr. Cox believed Ms. Faure should have come to her first. Ms. Faure allegedly told another department that the EED would no longer honor a memorandum of understanding, even though the EED had every intention to honor it. (Faure Dep. at 24, 38.)

Dr. Abrams reported to HR that "[Ms. Faure] is venting to her faculty and other EED faculty/staff about [Dr. Cox] and me. It's unprofessional and it's causing climate issues. I would like some guidance as far as next steps." (Abrams Dep., Ex. G at 101–105.)

Dr. Cox and Ms. Faure met with Heather Eurez, OSU HR Associate for the OSU College of Engineering, to address the recent issues. (Eurez Dep. at 84, Ex. G at 100.) In that meeting, Plaintiff expressed concern about changes taking place in the Department and a perceived lack of communication about these. (Eurez Dep. Ex. G, p. 100.) Ms. Eurez concluded that Ms. Faure and Dr. Cox were not "on the same page about things within the EED" and how the Department was to move forward, but by the end of the meeting, all members agreed to move forward positively. (Eurez Dep. 84–86; Cox Dep. 139–140.)

7

The situation did not improve. On September 16, 2016, Dr. Cox and Ms. Faure met again, this time with Associate Chair Dr. Abrams and HR Director Smith, to discuss Dr. Cox, Dr. Abrams, and Ms. Faure's tense relationship. (Faure Dep., Ex. 29.) According to Dr. Cox, even after that meeting, Ms. Faure complained about the lack of office supplies and coffee to a lab supervisor instead of to Dr. Cox. Ms. Faure allegedly told lecturers to document their actions, and that one lecturer was leaving because of Dr. Cox. (Cox Dep. at 302, Ex. G at 38.)

In late January 2017, three ETC faculty members allegedly informed Dr. Abrams that Ms. Faure made them feel that the "sky is falling" and they were concerned she would punish them for supporting either Dr. Abrams's or Dr. Cox's leadership. (Abrams Dep. Ex. G. at 89.) Dr. Abrams further alleges that Ms. Faure falsely reported to Dean Buchheit and HR Director Smith about Dr. Abrams allegedly not responding to EED lecturers' concerns regarding offer letters. (*Id.*)

In early March 2017, a lecturer asked to meet with HR and claimed Ms. Faure was making lecturers fear for their jobs, giving "the impression that the sky is falling," that there were communication issues, and that there was a toxic environment "because of [Ms. Faure's] inability to either accept change [in the Department]." (Miller Dep. 52–54.) The lecturer was nervous speaking with HR, for fear that Ms. Faure would retaliate and not reappoint her. (*Id.* at 53–54.)

Another lecturer, Dr. Lynn Hall, asked Dr. Abrams if anyone in the ETC was being targeted for termination because Ms. Faure had allegedly said that another ETC member's job was in jeopardy for not having a Ph.D. (Abrams Dep. Ex. G at 91–92; Hall Dec. ¶10.) Dr. Hall was nervous to speak with Dr. Abrams about Ms. Faure's statements out of fear that Ms. Faure would punish her or retaliate against her for supporting Dr. Cox and Dr. Abrams. (Hall Dec. ¶11.)

### E. Ms. Faure's Termination

1. <u>January 13, 2017 Meeting</u>

On January 13, 2017, Dean Williams called a meeting with EED leadership to discuss the climate in the EED. (Frueler Dep 45:10–14.) The attendees included Ms. Faure, Dr. Cox, Dean Williams, Dean Buchheit, Dr. Freuler, and others. (Williams Dep. at 16:14–20.) The purpose of the meeting was "to hear from the college office about their encouraging the Department to come together and support Dr. Cox." (Frueler Dep. at 44:20–23.) Dean Williams asked each person on the leadership team where their concerns were and what they thought of the state of the department. (Rhoads Dep. at 18:2–6.) Ms. Faure avers that she did not bring up Dr. Cox's racist comments or retaliatory actions because she did not believe that Dean Williams would be receptive, and she was concerned that there was no mediator present. (Faure Dep. at 539:21–540:2.) Instead, Ms. Faure discussed more general concerns that she and others had with the EED. (*Id.* at 54:13–15.) Ms. Faure allegedly raised her voice during this meeting and people outside the room could hear her.

At the end of the meeting Dr. Cox and Dean Williams walked out together. Dr. Cox claims that Dean Williams said, "Mary [Faure] was going to be terminated." (Cox Dep. at 71:12–13, 75:4–11; 82:8–13.) Dean Williams then allegedly asked Dr. Cox if "any other people needed to be terminated." (*Id.* at 77:13–14.) Dr. Cox was surprised by this "abrupt" statement and did not respond. (*Id.* at 77:10–24.) Dr. Cox claims that the Dean did not ask for her opinion about whether Ms. Faure should be retained. Instead, he simply told Dr. Cox that Ms. Faure was going to be terminated, and that was the end of the conversation. (*Id.* at 81:19–21, 77:10–24, 73:6–74:5.)

Dean Williams testifies, however, that he never told Dr. Cox that he was terminating Ms. Faure after the January 13, 2017 meeting. (Williams Dep. at 12:1–11, 14:8–7.)

9

2.  <u>HR Investigation</u>

After the January 13, 2017 meeting, HR Director Heather Miller began reviewing interviews, emails, and efforts at informal coaching related to Ms. Faure. Ms. Miller discussed the issues with Dr. Cox, Dr. Abrams, Dean Buchheit, and Dean Williams, and she ultimately concluded that the "correct step would be termination." (Miller. Dep. 69–70.) Ms. Miller sent a memo to Mr. Smith on March 10, 2017 summarizing her concerns about Ms. Faure's leadership as Director of the ETC and recommended that OSU terminate her employment. (Miller Dep. Ex. G at 93-94). In the memo, Ms. Miller noted that Plaintiff:

- failed to appropriately address concerns with Dr. Cox, which negatively affected Department morale;

- repeatedly exhibited inappropriate behavior, inconsistent with the need to collaborate professionally and effectively to resolve issues; and

- failed to demonstrate the leadership qualities inherent to and expected of her position by not presenting a united front or supporting the established goals for the future of the EED.

(*Id.*) Ultimately, Ms. Miller concluded Plaintiff's "actions and behavior have created an environment of low morale, uncertainty, fear of job security, concerns for the future of the ETC, uncertainty of goals and priorities, and distractions to departmental leadership and employees." (*Id.*)

Ms. Faure alleges that while HR was investigating her, Dr. Cox never offered her a Performance Improvement Plan and she "wasn't offered coaching." (Faure Dep. at 239:1–7.) Ms. Faure also alleges she was not warned that she might be terminated even though an HR employee testified that it was her expectation that a supervisor would "warn their employee, either verbally or in writing" that "failure to change their behavior could result in discipline or termination in a situation where an employee's communication did not comport with their manager's expectations. (Eurez Dep. at 22:1–12.)

10

### 3. OSU Terminates Ms. Faure

The parties dispute who decided to terminate Ms. Faure. On April 4, 2017, HR Director Miller (HR), Mr. Smith (HR), Dr. Cox, and Dean Buchheit met to discuss corrective action and allegedly decided to terminate Plaintiff. (Smith Dep. at 89; Miller Dep. at 86.) HR Director Smith alleged that, during the meeting, Dr. Cox told the group that "she decided to terminate Mary Faure." (Smith Dep. at 90:3–6.) Mr. Smith testified that he, Dean Buchheit, and HR Director Miller were "all supportive of Dr. Cox's direction." (*Id.* at 90:19–22.)

Dr. Cox later maintained that she "was never given the opportunity to decide whether or not to terminate Mary Faure. That was nothing that was put in my lap and that was not a decision that I made." (*Id.* at 340:1–5.) Instead, she claims that Dean Williams told her Mary Faure would be terminated and she "trusted her supervisor [Dean Williams] and HR to do what they needed to do." Later, however, Dr. Cox submitted this affidavit: "The decision to terminate Mary's employment was a collective decision between me, Human Resources, and the Dean of the College of Engineering." (Cox Dep. at Ex G.) Additionally, in response to interrogatories in this case, Defendants listed Dr. Cox as a decisionmaker in the termination. (*Id.* at Ex C.)

Dean Williams denies terminating Ms. Faure, denies recommending that Ms. Faure be terminated, denies that he directed her termination, and denies suggesting her termination. (Williams Dep. at 11–14.)

The recommendation from Dr. Cox, Associate Chair Dr. Abrams, Dean Williams, HR Director Miller, and HR Director Smith was sent to OSU's central Office of Human Resources, which allegedly reviewed the information to determine if there was a sufficient basis for termination. (Miller Dep. at 86–87; Def's Mot. Ex. 2, Ex. 3). Ultimately, the central HR office approved proceeding with Ms. Faure's termination. On May 19, 2017, Dr. Cox informed Ms. Faure

that her employment was terminated effective May 20, 2017. (Cox Dep. Ex. D.) Ms. Faure's job responsibilities were absorbed by Dr. Abrams and Dr. Hall, two white employees. (Cox Dep. 284–285; Hall Dec. ¶2.)

Two years after her termination, in May 2019, Ms. Faure filed suit against OSU and Dr. Cox alleging discrimination and retaliation in violation of Title VII and 42 U.S.C. §1981 and retaliation in violation of the First Amendment. (*See generally* Compl., ECF No. 1.)

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts.").

Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

## III.     ANALYSIS

### A. <u>Eleventh Amendment Bar to Plaintiff's §1981 and §1983 Claims</u>

The Court first addresses Defendants' argument that the Eleventh Amendment bars Plaintiff's § 1981 and § 1983 claims against OSU and Dr. Cox because it is a jurisdictional question. (Def.'s Mot. at 23.) Plaintiff agrees that § 1983 claims are barred against OSU by the Eleventh Amendment but argues that she may bring § 1981 and § 1983 claims against Dr. Cox in her official capacity for prospective injunctive or declaratory relief and in her personal capacity for damages. (Pl.'s Resp. at 1, 48.)

The Eleventh Amendment "bars all suits, whether for injunctive, declaratory, or monetary relief, against the state and its departments." *Ford Motor Co. v. Dep't of Treasury of Indiana*, 323 U.S. 459, 464 (1945). It also bars suits for damages against State officials in their official capacities under § 1983. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). State officials may, however, be sued in their official capacity for injunctive or declaratory relief and in their personal capacity for damages. *Ex parte Young*, 209 U.S. 123 (1908) (finding that a federal court may enjoin a state official in their official capacity from violating federal law); *Hafer v. Melo*, 502 U.S. 21, 25-27 (1991) (holding the Eleventh Amendment does not bar suits for damages against State Officials in their personal capacity). Therefore, Plaintiff's §1981 and § 1983 claims against Dr. Cox are not barred by the Eleventh Amendment because she sues Dr. Cox in her official capacity for

prospective injunctive or declaratory relief, and in her personal capacity for damages. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000).

### B. Title VII Claims Against Dr. Cox

OSU argues that because Title VII does not impose individual liability, Dr. Cox, as Plaintiff's former supervisor, cannot be held liable under Title VII as a matter of law. (Def.'s Mot. at 18.) Plaintiff clarifies that Defendant Cox is sued under 42 U.S.C. § 1981 and § 1983, not Title VII. (Pl.'s Resp. at 38.)

### C. Title VII and § 1981 Reverse Race Discrimination

Defendants move for summary judgment on Plaintiff's Title VII claim against OSU and § 1981 claim against Dr. Cox. Title VII prohibits an employer from "discharg[ing] without cause" an employee because of her "race, color, religion, sex…" 42 U.S.C. § 2000e, *et seq*. § 1981 prohibits "intentional race discrimination in the making and enforcing of contracts involving both public and private actors," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006) (citations omitted).

The same legal standards apply to Title VII as to § 1981. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009) ("[W]e review § 1981 claims under the same standard as Title VII claims."). The Court therefore applies Title VII common law to the § 1981 claim and the two claims rise and fall together.

#### 1. Direct Evidence

An employee may prove race discrimination based on direct or circumstantial evidence. *Johnson v. Kroger Co.*, 319 F.3d 858, 864 (6th Cir. 2003). "Direct evidence is evidence that requires the conclusion, without any inference, that unlawful discrimination was at least a

14

motivating factor in an employer's actions." *Douglas v. Eaton Corp.*, 577 F. App'x 520, 523, n.1 (6th Cir. 2014) (citing *Johnson*, 319 F.3d at 865).

Discriminatory comments by a final decision-maker may be direct evidence of discrimination. *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003). In this analysis, a court considers whether the comments were: "(1) made by a decision-maker within the scope of his or her employment; (2) related to the decision-making process; (3) more than merely vague, ambiguous, or isolated remarks; and (4) made proximate in time to the act of termination." *Peters v. Lincoln Electric Co.*, 285 F.3d 456, 477–78 (6th Cir. 2002). No factor "is individually dispositive of discrimination, but rather, they must be evaluated as a whole, taking all of the circumstances into account." *Id.*

In this case, Plaintiff claims that Dr. Cox's statements about white people are direct evidence of Dr. Cox firing Plaintiff because of her race. Plaintiff argues that Dr. Cox fired her soon after she complained to HR and EED leadership about Dr. Cox's "racist beliefs." (Pl.'s Resp. at 45.) Defendants respond that Dr. Cox's statements are not direct evidence that OSU terminated Plaintiff because of her race because the statements occurred almost 18 months before Plaintiff's termination and were stray, isolated remarks unrelated to the termination decision. (Def.'s Mot. at 12.)

When viewing the evidence in a light most favorable to Ms. Faure and drawing all reasonable inferences in her favor, no reasonable jury could find that Dr. Cox's alleged statements are direct evidence that Dr. Cox terminated Ms. Faure because of her race. Plaintiff alleges that Dr. Cox said the following to her or other coworkers: "I despise white people"; the EED has "so many old white men"; "I have been at a disadvantage my whole career because of you people"; discussed the "barriers and disadvantages that white people had put up against her in her previous

15

life"; said would remove an older white professor from a committee. According to other EED employees, it was "common knowledge in the Department" that Dr. Cox referred to white individuals in the EED as "big lips" and "Colonel Sanders."

The Court finds that these statements are not direct evidence that Ms. Faure was fired because of her race because the statements do not reference Ms. Faure or her termination. *Peters*, 285 F.3d at 78. The evidence requires an inferential step to connect the comments from white people generally to Ms. Faure, and another inferential step to connect the comments to Ms. Faure's termination.

### 2. Circumstantial Evidence of Discrimination

In the absence of direct evidence of race discrimination, a plaintiff may use circumstantial evidence, either under the *McDonnell-Douglas* framework or by a cumulation of other evidence sufficient to yield an inference of discrimination. *See Shah v. General Electric Co.*, 816 F. 2d 264, 268 (6th Cir. 1987); *Haji v. Columbus City Schs.*, 621 F. App'x 309, 315 (6th Cir. 2015). Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first demonstrate a *prima facie* case of discrimination by showing that she: (1) "is a member of a protected class," (2) "was qualified for h[er] job," (3) "suffered an adverse employment decision," and (4) "was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008); *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 451 (6th Cir. 2017) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the plaintiff makes such a showing, the burden shifts to the defendants, who must "offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Id.* A successful articulation on the part of the defendants then shifts the

Case: 2:19-cv-01949-EAS-CMV Doc #: 51 Filed: 12/14/21 Page: 17 of 32 PAGEID #: 4377

burden back to the plaintiff to prove that the defendant's proffered reason was "merely a pretext for discrimination." *Id.* at 391–92.

For reverse discrimination claims, the Sixth Circuit has slightly adapted the *McDonnell-Douglas* framework. To establish the first element of the *prima facie* case, the plaintiff must show there are "background circumstances" indicating the defendant "is that unusual employer who discriminates against the majority." *Nelson v. Ball Corp.*, 656 F. App'x 131, 134 (6th Cir. 2016) (citing *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985))*.* The second and third elements remain the same but the fourth element is modified to require the plaintiff to show that she "was treated differently than similarly situated employees of a different race." *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 837 (6th Cir. 2012).

### a. *Prima facie* Case of Reverse Discrimination

In their motion for summary judgment, Defendants contest the first and fourth element of Plaintiff's *prima facie* case. The first element of a reverse discrimination *prima facie* case requires Ms. Faure to show "background circumstances" supporting her contention that OSU is the "unusual employer who discriminates against the majority." *Nelson v. Ball Corp.*, 656 F. App'x 131, 134 (6th Cir. 2016). The Sixth Circuit has held that "the mere fact that a racial minority took an adverse action against a [non-minority plaintiff] is sufficient to satisfy the background circumstances requirement." *Leavey v. City of Detroit*, 467 F. App'x 420, 425 (6th Cir. 2012); *see also Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 339 (6th Cir. 2009). The "background circumstances" requirement can also be satisfied by "significant evidence in the form of statistical data" showing that the employer considered race in previous employment decisions or that the employer preferred promoting non-white employees. *See Sutherland v. Mich. Dep't of*

*Treasury*, 344 F.3d 603, 615 (6th Cir. 2003); *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002).

> i.     First Element: Background Circumstances

Here, Ms. Faure has provided sufficient evidence to meet the first element of the *prima facie* case at this juncture.  Dr. Cox is a racial minority and there is a genuine dispute of material fact as to whether she terminated Ms. Faure. Even though her signature was on the termination letter, the parties dispute whether Dr. Cox was the primary decision-maker in terminating Ms. Faure, the non-minority plaintiff. Dr. Cox and at least two others claim that Dr. Cox along with three white administrators—Dean Williams, and HR personnel Mr. Smith and HR Director Miller—made a collective decision to terminate Plaintiff. Dr. Cox alternatively claims Dean Williams was the primary decision-maker because he told Dr. Cox after the January 13th meeting that "Mary Faure was going to be terminated." Dean Williams, however, testified that he never told Dr. Cox that he was terminating Ms. Faure at the January 13th meeting, and that he "did not terminate Ms. Faure, suggest that Ms. Faure should be terminated, [or] direct anyone to terminate Ms. Faure." One HR employee alleges that Dr. Cox told him, Dean Buchheit, and HR Director Miller that "she decided to terminate Mary Faure," and they were "all supportive of Dr. Cox's direction." Other OSU staff allege that Ms. Faure was only terminated because Dr. Cox wanted her to be terminated.

If a jury believed the testimony of the OSU staff, Ms. Faure would prevail under the cat's paw theory. That is, "[b]y relying on th[e] discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice—h[er] cat's paw." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 350 (6th Cir. 2012) at 350. "If a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse

employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable[.]" *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

Thus, reading these conflicting accounts in a light most favorable to Plaintiff and drawing all inferences in her favor, a reasonable jury could find that Dr. Cox was the primary decision-maker in Ms. Faure's termination so that "a racial minority took an adverse action against a [non-minority plaintiff]" or was the cause of the discriminatory information flow relied upon by the primary decision maker, she thus satisfying the *prima facie* first element's background-circumstances requirement. *Leavey*, 467 F. App'x at 425.

ii.  *Fourth Element: Similarly Situated Comparators, Other Evidence Suggesting Discrimination*

As to the fourth element, Defendants argue that Plaintiff cannot show she was "treated differently than similarly situated employees of a different race." *Nelson*, 656 F. App'x at 134. To be considered "similarly situated," the situation of the comparator must be "similar to the plaintiff in all relevant aspects." *Highfill v. City of Memphis*, 425 F. App'x 470, 474 (6th Cir. 2011). Plaintiff admits that she cannot present any comparators who are similarly situated. Instead, she argues that other circumstantial evidence of discrimination is sufficient to make a *prima facie* case. (Pl.'s Resp. at 58.)

The Supreme Court emphasized that the *prima facie* standard offered in *McDonnell Douglas* was not "inflexible" and that the specific proof required of the plaintiff in that particular case was "not necessarily applicable in every respect in differing factual situations." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 n.6 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802, n.13). Additionally, the burden of establishing, much less creating a genuine issue of material fact over, a *prima facie* case "is not onerous." *See Burdine*, 450 U.S. at 253.

If there are no similarly situated comparators, the Sixth Circuit allows other evidence that is "sufficient to create an inference of discrimination" to establish a *prima facie* case. *See Shah*, 816 F. 2d at 268. In *Lindsay v. Yates*, the Sixth Circuit found that the plaintiffs met the fourth element of their *prima facie* case for race discrimination in housing even though they did not present evidence of similarly situated individuals who were treated more favorably. 578 F.3d 407, 417–418 (6th Cir. 2009) (inferring discrimination because of the suspicious timing of the defendants' termination of the purchasing agreement—within a few days after the seller discovered the buyers were African American). The Court noted that "so long as additional evidence exists—beyond showing the first three elements of the *McDonnell Douglas* test—that indicates discriminatory intent in light of common experience, the required inference of discrimination can be made in satisfaction of the *prima facie* case." *Id.* (citations omitted); *see also Blair v. Henry Filters, Inc.*, 505 F.3d 517, 530 (6th Cir. 2007) (inferring discrimination where the supervisor "(1) repeatedly mocked [ the plaintiff's] age, (2) removed [the plaintiff] from a lucrative account because of his age, and (3) told other employees that he wanted younger salesmen."); *Jefferson v. Intelligrated, Inc.*, No. 1:18-cv-00894, 2021 U.S. Dist. LEXIS 176066, at *15–16 (S.D. Ohio, Sept. 16, 2021) (inferring discrimination where the defendant employer transferred several of plaintiff's business accounts to white employees despite evidence that the plaintiff performed better than the white employees).

In support of her argument that other evidence suggests an inference of discrimination, Plaintiff states "[t]he facts Ms. Faure has developed are accurately understood as sufficient circumstantial evidence to create a genuine issue of material fact on discriminatory…motivation." (Pl.'s Resp. at 51.) Plaintiff further states that "deeming Ms. Faure an intolerably disruptive force was a fig leaf to justify a racially discriminatory and retaliatory termination." (Pl.'s Resp. at 53.)

20

Specifically, Plaintiff alleges that, on January 25, 2016, Dr. Cox said, "I despise white people" and discussed the "barriers and disadvantages that white people had put up against her in her previous life." Plaintiff alleges that Dr. Cox "pointed her finger" at Plaintiff and said, "I have been at a disadvantage my whole career because of you people." According to other EED employees, it was "common knowledge in the Department" that Dr. Cox referred to white individuals in the EED as "big lips" and "Colonel Sanders." Additionally, other EED employees testified that they heard Dr. Cox say the EED had "so many old white men" and that she would remove an older white professor from a committee. One administrative assistant testified that Dr. Cox made race-based comments at least once a month during the 16 months she worked for Dr. Cox. (McGrath Dec. at ¶ 7.)

While these statements may not suffice as direct evidence of discrimination, they are sufficient for a jury to infer discrimination. The Plaintiff therefore has shown a *prima facie* case of reverse race discrimination.

### b.  Legitimate, Non-Discriminatory Reason for Termination

OSU has articulated a legitimate, non-retaliatory reason for terminating Plaintiff's employment—namely, her failure to adapt to the new departmental transition and inability to communicate professionally with her superiors and subordinates. (Def.'s Mot. at 20.) The burden now shifts back to Plaintiff to produce evidence from which a reasonable jury could find Defendants' proffered reason for terminating her is pretext for race discrimination.

### c.  Pretext

A plaintiff may establish pretext by showing the defendant's reason for termination: (1) lacked a basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse employment action. *Seeger v. Cincinnati Bell Tel. Co., LLC*,

681 F.3d 274, 285 (6th Cir. 2012). To show pretext, Plaintiff must show "more than a dispute over the facts upon which the discharge was based." *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007). She must show "sufficient evidence from which the jury could reasonably reject [Defendants'] explanation and infer that [Defendants] intentionally discriminated against [her]." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–516 (1993).

Here, Plaintiff argues that Defendants' proffered reason for her termination lacks a basis in fact and was insufficient to warrant termination because her conduct did not affect the core functions and day-to-day activities of EED, or Dr. Cox's ability to perform her job, contrary to OSU's assertions that she was "disruptive." (Pl.'s Resp. at 56.)

Defendants respond that Ms. Faure's spread misinformation multiple times which caused lecturers to fear that they would lose their jobs and complained to EED staff about issues that should have been addressed to Dr. Cox. Ultimately, HR concluded that Plaintiff's "actions and behavior have created an environment of low morale, uncertainty, fear of job security, concerns for the future of the ETC, uncertainty of goals and priorities, and distractions to departmental leadership and employees."

Viewing all the evidence in a light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the Court finds Plaintiff has established a genuine issue of material fact as to whether she was fired because of her race. Plaintiff's contention that her behavior during the January 13, 2017 meeting was not sufficient to fire her was supported by Dean Williams's admission that her conduct was not sufficient for termination.

Plaintiff argues Defendants' deviation from normal termination protocol is further evidence of pretext. (Pl.'s Resp. at 58.) While an "arguable failure to follow its own written…policy" can, in certain circumstances, support the inference of pretext, *Coburn v.*

*Rockwell Automation, Inc.*, 238 F. App'x 112, 126 (6th Cir. 2007), "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 246 (6th Cir. 2005). In *White*, the Court found the defendant's deviation from its protocol did not establish pretext because the deviation was minor and insufficiently established. *Id.* When an employer is not required to follow a procedure and deviates without harm to the plaintiff, no inference of pretext could be drawn. *See, e.g., Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 896–97 (6th Cir. 2020).

Here, there is sufficient evidence that OSU considerably deviated from its protocol and there was harm to Ms. Faure. Ms. Faure was not placed on a Performance Improvement Plan or formally warned that she could be terminated even though there is evidence that OSU employees have a clear expectation that they will receive a warning before termination. Her contention is supported by another OSU staff member's testimony that he had been part of the termination process for "at least a couple dozen" employees and every one of them was warned that failure to correct behavior might result in termination. Defendants respond that in appropriate cases, the university reserves the right to move to immediate termination when warranted. When viewing the evidence in a light most favorable to Ms. Faure, there is a genuine issue of material fact as to whether OSU deviated from its termination protocol. Consequently, Plaintiff's Title VII and § 1981 discrimination claims survive summary judgment.

### D. <u>Title VII Retaliation</u>

Title VII's antiretaliation provision forbids employer actions that "discriminate against" an employee because she "opposed" a practice that violates Title VII. 42 U.S.C. §2000e–3(a). A plaintiff may show retaliation using direct or circumstantial evidence. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). To establish a *prima facie* case of retaliation using

circumstantial evidence, a plaintiff must show that: (1) she engaged in protected activity; (2) the defendant knew of this activity; (3) the defendant took an action that was materially adverse to her; and (4) there is a causal connection between the protected activity and the materially adverse action. *Id.* If she presents sufficient evidence to establish a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the adverse action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once proffered, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual. *Id.* at 804.

Defendants argue that Plaintiff's Title VII retaliation claim fails at summary judgment because she cannot show evidence of (1) a causal connection between her protected activity and termination, or (2) pretext. (Def.'s Mot. at 18–23.)

### 1. Causal Connection Between Protected Activity and Termination

To meet the fourth element of the *prima facie* case for retaliation, Plaintiff must show but-for causation—that but for her protected activity of challenging Dr. Cox's alleged racist statements, Defendants would not have terminated her. *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *Sharp v. Profitt*, 674 F. App'x 440, 450 (6th Cir. 2016).

One way to show but-for causation is temporal proximity between the defendant's adverse action and the plaintiff's protected activity. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). The Sixth Circuit has held that a two-to-five-month gap between the protected activity and the adverse action insufficient to establish *prima facie* causation based on temporal proximity alone. *See, e.g.*, *McCowen v. Vill. of Lincoln Heights*, 624 F. App'x 380, 384 (6th Cir. 2015) (eight months); *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (two to five months); *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (four months). At the same time, a longer gap does not categorically preclude a finding of causation. *Sharp v. Aker Plant*

*Servs. Grp.*, Inc., 600 F. App'x 337, 341 (6th Cir. 2015); *George v. Youngstown State Univ.*, 966 F.3d 446, 459–62 (6th Cir. 2020). Even if the gap in time is long and precludes a finding of causation based on temporal proximity alone, an employee can still prevail if she "couple[s] temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey*, 516 F.3d at 525.

Plaintiff's evidence of temporal proximity—a five or six-month gap between her last alleged protected activity and termination—is too long to establish causation from temporal proximity alone. Plaintiff first opposed Dr. Cox's comments in January or February 2016, when she met with Martin Smith, the Human Resources Director for the College of Engineering. Ms. Faure told Mr. Smith that Dr. Cox had said that she "despised white people" and "disliked white men" then said, "if you repeat that, I'll deny it." Ms. Faure met with Mr. Smith again a few months later in March and again in April or May to say that Dr. Cox's racist comments had continued.

On November 26, 2016 Ms. Faure sent an email to Dean Williams:

> After much reflection and many months of abuse, I am writing as the emissary for a group of distressed EED employees who desire to report to you personally about the harassment, hostility, threats, intimidation bullying mismanagement, racist remarks, theft (no consent) of intellectual property, observed favoritism for a few and lying that they have endured from Monica Cox and Lisa Abrams.

In December 2016, Ms. Faure met with Mr. Smith to discuss the email. Ms. Faure said the purpose of the meeting was not "a complaint of racism it was a complaint of retaliation." Ms. Faure was thereafter terminated in May 2017. The five or six-month gap between her last alleged protected activity in December 2016 and her termination in May 2017 is too long to create a presumption of causation based on temporal proximity alone.

In further support of her argument for causation, Plaintiff alleges that OSU deviated from its normal termination procedures. Evidence of an employer's deviation from its own internal

disciplinary procedures is evidence of causation. *See Greene v. United States VA*, 605 F. App'x 501, 506 (6th Cir. 2015). The Court already determined that there is a genuine issue of material fact as to whether OSU deviated from its protocol and caused harm to Plaintiff by failing to warn her before termination or instituting a Performance Improvement Plan. *See supra* Section III.C.2.c.

Viewing all facts in the light most favorably to Plaintiff, the Court finds that the evidence of temporal proximity coupled with evidence of the Defendants' deviation from protocol is sufficient to establish a *prima facie* case of Title VII retaliation, which is not an onerous burden.

## 2. Pretext

Defendants' legitimate, non-discriminatory reason for the termination was Plaintiff's "failure to adapt to the new departmental changes and her inability to communicate professionally with her colleagues." (Def.'s Mot. at 36.) Plaintiff makes the same arguments for Title VII discrimination as she does for Title VII retaliation: (1) the temporal proximity between her complaints and her termination, and (2) OSU's deviation from termination protocol. (*See* Pl.'s Resp. at 53–65.) For the same reasons as stated above, there is sufficient evidence to establish a genuine issue of material fact as to whether Defendants' proffered reason for termination was pretext. *See supra* Section III.C.2.c.

## E. First Amendment Retaliation

The First Amendment prohibits retaliation by a public employer against an employee based on the employee's protected speech. *See Connick v. Myers*, 461 U.S. 138, 142 (1983). To establish a claim of First Amendment retaliation, an employee must demonstrate that: (1) she engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against her that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated

at least in part by her protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). Additionally, a plaintiff acting as a public employee carrying out her professional responsibilities during her speech is not protected. *See Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007); *Leavey v. City of Detroit*, 467 F. App'x 420, 429 (6th Cir. 2012).

**1. Constitutionally Protected Speech**

To establish that she engaged in constitutionally protected speech, Plaintiff must show that 1) her speech "relates to a matter of public concern," and that 2) her "free speech interests outweigh the efficiency interests of the government as employer." *See Rose v. Stephens*, 291 F.3d 917, 920 (6th Cir. 2002); *Connick v. Myers*, 461 U.S. 138, 147 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968). The initial inquiry into determining whether a public employee's speech is a matter of public concern is a question of law for the court to decide. *Rankin v. McPherson*, 483 U.S. 378, 386 n.9 (1987).

Speech "relates to a matter of public concern" if it relates to any matter of political, social, or other concern to the community. *See Connick*, 461 U.S. at 146. A public employee's speech dealing with "matters only of personal interest" is generally not protected. *Id.* at 147. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48. The entire speech "does not have to address matters of public concern, as long as some portion of the speech does so." *Id.* at 148–49.

Plaintiff argues that she criticized Dr. Cox's statements to Dr. Cox, EED leadership, and HR personnel multiple times in 2016. First, she allegedly criticized Dr. Cox's statements as "racist and unprofessional" in the January 25, 2016 meeting between the two of them. In February and March 2016, Ms. Faure complained to HR personnel, Mr. Smith, about Dr. Cox's alleged

statements that she "despised white people" and "old white males." Ms. Faure met again with Mr. Smith in late April or early May 2016 and told him that talking to Dr. Cox "didn't work, the—the [racist] comments have continued." In May 2016, Ms. Faure "went to Lisa Abrams and told her that [she] had been to see Marty [Smith]" and that she "complained about racist remarks and threats." Ms. Faure sent an e-mail on November 26, 2016 to Dean Williams reporting the alleged "harassment, hostility, threats, intimidation, bullying mismanagement, racist remarks, theft of intellectual property, observed favoritism for a few and lying" by Dr. Cox and Dr. Abrams. Ms. Faure avers that she met again with HR Director Smith, and Dean Buchheit, in December 2016 to discuss Dr. Cox's alleged "racism and retaliation." Plaintiff argues that each of these complaints to OSU personnel and Dr. Cox challenged racist policies or comments and therefore involved matters of public concern.

Defendants argue that Plaintiff's speech was not a matter of public concern because the "focus" and "point" of Plaintiff's speech was on the internal workings of the office and her personal complaints about it, rather than on racism. (Def.'s Mot. at 25–26.) The record indicates, however, for at least some of Plaintiff's speech, "the primary focus, point, or communicative purpose" was Dr. Cox's alleged racist statements. *See Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir. 2004). As stated above, Plaintiff's entire speech does not have to focus on matters of public concern for it to be constitutionally protected. *See Connick*, 461 U.S. at 148.

The Court finds that Plaintiff's complaints that Dr. Cox made racially discriminatory comments and policies qualify as protected speech because "it is well settled that statements concerning…allegedly racially discriminatory policies involve[s] a matter of public concern." *Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) (citing *Connick*, 461 U.S. at 146). Ms. Faure's complaints about the workplace and Dr. Cox's leadership, however, are not matters of public

concern. *See, e.g.*, *Burgess v. Paducah Area Transit Auth.*, 387 F. App'x 538, 544–45 (6th Cir. 2010) (finding plaintiff's concerns relating to "the atmosphere of the office…poor business practices, management…" were not matters of public concern).

The Court now determines whether Plaintiff's free speech interest outweighs OSU's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 570. In balancing the parties' interests, courts consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388 (citing *Pickering*, 391 U.S. at 570–73). Relevant factors include "the manner, time, and place of the employee's expression," as well as "the context in which the dispute arose." *Rankin*, 483 U.S. at 388 (citations omitted).

Plaintiff contends that her statements were not disruptive. (Pl.'s Resp. at 73.) Defendants, in response, point to Ms. Faure's conversations with lecturers in which she allegedly told them not to trust Dr. Cox and Dr. Abrams, they should be worried for their jobs, and they were not valued members of the Department. According to Dr. Cox, at least four lecturers were allegedly concerned about their future with the EED because of Ms. Faure. Dr. Abrams eventually reported the conversations to HR, saying that Ms. Faure was "venting to her faculty and other EED faculty/staff about [Dr. Cox] and me. It's unprofessional and it's causing climate issues."

The evidence that Defendants point to as disruptive is Ms. Faure's speech about lecturers potentially losing their jobs and the EED's management style, not her speech about Dr. Cox's alleged statements concerning race. The relevant speech for this analysis is Ms. Faure's race-based comments because that is the speech that relates to a public concern. There is no evidence that this

speech caused a disruption or interference in OSU's operations or harmony in the workplace. The Court therefore finds that Ms. Faure's interest in complaining to HR about Dr. Cox's allegedly racist comments outweighs Defendants' interests in efficiency and harmony in the workplace. Ms. Faure engaged in constitutionally protected speech when she made complained about Dr. Cox's allegedly racist statements.

## 2. Speech as a Motivating Factor in Termination Decision

Defendants do not dispute the second element— that they took an adverse action against Ms. Faure that would "deter a person of ordinary firmness from continuing to engage in that conduct." *See Connick v. Myers*, 461 U.S. 138, 142 (1983). The Court therefore moves to the third element—whether Ms. Faure's termination was motivated at least in part by her speech. To establish this element, Plaintiff "must produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that the [adverse employment action] would not have occurred but for his engagement in protected activity." *Eckerman v. Tennessee Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010).

Defendants argue that Plaintiff cannot establish that her November 2016 email to Dean Williams was a motivating factor for her termination because she was terminated seven months later, erasing any inference of causation provided by temporal proximity. Defendants also argue that they would have terminated Plaintiff regardless of her protected conduct. (Def.'s Mot. at 27.)

Plaintiff argues that her termination was at least in part motivated by her many complaints starting in January 2016 and going to December 2016 about Dr. Cox's allegedly racist statements. Plaintiff alleges that Dr. Cox's behavior towards her changed in the summer of 2016 after she complained about Dr. Cox's allegedly racist statements. She further alleges that Dr. Abrams told her that Dr. Cox did not want her going to HR anymore with complaints about racist statements.

There is also evidence that OSU's HR did not act to address Plaintiff's complaints about Dr. Cox's statements and that she would not have been fired if Dr. Cox wanted her to stay. Overall, Defendant's reason for termination was that Ms. Faure was disruptive and unprofessional. Viewing this evidence in a light most favorable to Plaintiff, the Court finds there is a genuine issue of material fact as to whether that Ms. Faure's repeated complaints about Dr. Cox's alleged racism was a motivating factor in their decision to terminate her.

### 3. Dr. Cox Is Not Entitled to Qualified Immunity

The qualified immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights. *See Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011). "Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Id.* The court has discretion to first decide whether there was a constitutional violation at all, or whether clearly established law was violated. *Id.*

The fundamental inquiry is whether public officials are "on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation omitted). "[I]n light of pre-existing law[,] the unlawfulness must be apparent." *Id.* To determine that a right was clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Defendants argue that Dr. Cox is entitled to qualified immunity on Plaintiff's First Amendment retaliation claim. (Def.'s Mot. at 29.) Defendants contend that Dr. Cox was not aware of some of Plaintiff's complaints about her and there is no evidence that Dr. Cox had an improper motive or intent when terminating Plaintiff.

31

Plaintiff has sufficiently alleged conduct by Dr. Cox that, if proven true, would constitute a violation of her well-established First Amendment rights. Next, the inquiry moves to whether Plaintiff's right to complain about Dr. Cox's alleged racist practices was clearly established. Plaintiff cites Sixth Circuit precedent, and the Court agrees, that it is "clearly established" that "a public employer may not retaliate against an employee for her exercise of constitutionally protected speech." *Buddenberg v. Weisdack*, 939 F.3d 732, 741 (6th Cir. 2019). Dr. Cox is therefore not entitled to qualified immunity from Plaintiff's First Amendment retaliation claim.

## IV.

For the foregoing reasons, the Court **DENIES** Defendant's Motion for Summary Judgment. (ECF No. 44.) This case remains open.

**IT IS SO ORDERED**.

<u>12/14/2021</u>                                        <u>s/Edmund A. Sargus, Jr.</u>
**DATE**                                                 **EDMUND A. SARGUS, JR.**
                                                         **UNITED STATES DISTRICT JUDGE**